IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNIQUE SPORTS PRODUCTS, INC., Plaintiff, v. FERRARI IMPORTING COMPANY d/b/a GAMMA SPORTS, Defendant. | CIVIL ACTION FILE NO. 1:09-CV-660-TWT |

ORDER

This is an action for trademark infringement.  It is before the Court on the
Plaintiff's Motion for Partial Summary Judgment [Doc. 59]; the Defendant's Motion
for Summary Judgment of Non-Infringement and Cancellation [Doc. 61]; and the
Defendant's Motion for Summary Judgment of No Violation of the Final Judgment
[Doc. 71].  For the reasons set forth below, the Court GRANTS the Plaintiff's Motion
for Partial Summary Judgment [Doc. 59], DENIES the Defendant's Motion for
Summary Judgment of Non-Infringement and Cancellation [Doc. 61], and GRANTS
the Defendant's Motion for Summary Judgment of No Violation of the Final
Judgment [Doc. 71].

I. Background

Unique Sports Products, Inc. ("Unique") manufactures and sells sporting goods, including tennis racket grip tape.  In 1991, Unique acquired the TOURNA GRIP product line.  TOURNA GRIP is a LIGHT BLUE racket overgrip[1] used by many professional tennis players.  LIGHT BLUE TOURNA GRIP has been manufactured and sold since 1977.  In 2001, Unique received a federal trademark for the LIGHT BLUE color featured on TOURNA GRIP products.

Ferrari Importing Company also manufactures sporting goods equipment.  Ferrari markets racket grip tape in a variety of colors, including blue.  Depending on the product, white, black, and light blue are Ferrari's best selling overgrip colors.  In 1999, Unique filed suit against Ferrari, alleging that Ferrari's light blue overgrip tape was confusingly similar to TOURNA GRIP.  See Unique Sports Prods., Inc. v. Ferrari Importing Co., Inc. d/b/a Gamma Sports, No. 1:99-CV-0945.  In 1999, the parties negotiated a settlement that resulted in a consent judgment (the "Final Order").  The Final Order enjoined Ferrari from "using the Specified Light Blue Color, or any other counterfeit, copy or colorable imitation thereof, in any form, or in any manner in connection with overwrap grip material for sports rackets." [Doc. 60, Ex. 4 ¶ 3(b)].

In response to the Final Order, Ferrari darkened the color of its blue overgrip

---

[1]There are several types of racket grip tape.  Overgrip tape, applied over the original racket grip, is the subject of this lawsuit.

Case 1:09-cv-00660-TWT   Document 84   Filed 01/24/11   Page 3 of 20


tape.[2]  The Defendant asserts that customers, however, complained that the darker tape was not as absorbent.  Ferrari confirmed that this darker overgrip was not as moisture absorbent as the light blue tape had been.  In laboratory testing, however, there was no direct correlation between the pigment of the grip tape and the tape's moisture absorption capabilities.  (Carr Dep. at 81-83, 151-153, 157.)  Indeed, in 2000, Ferrari produced a dark blue grip tape that performed better than its original light blue tape. Id.  Ferrari achieved this improved performance without changing the physical color of the tape.  Id.

On March 10, 2009, Unique filed this lawsuit, alleging that Ferrari was again selling LIGHT BLUE overgrip tape that infringed Unique's trademark and violated the Final Order.  Ferrari contends that the LIGHT BLUE color is functional and therefore cannot be trademarked.  In response, Unique has filed a Motion for Partial Summary Judgment on the question of functionality [Doc. 59].  Ferrari has filed a Motion for Summary Judgment of Non-infringement and Cancellation [Doc. 61].  The Defendant asserts that the LIGHT BLUE color is not a proper mark because it is functional and has no secondary meaning.  Further, Ferrari argues that there is no likelihood of confusion between its products and those produced by Unique.  Finally,

---

[2]The Final Order defined the LIGHT BLUE used in TOURNA GRIP as any blue lighter than Pantone 293(c).

T:\ORDERS\09\Unique Sports Products\msjtwt.wpd           -3-

Ferrari has filed a Motion for Summary Judgment of No Violation of the Final Judgment [Doc. 71]. The Defendant argues that it has not sold any overgrip tape that violates the Final Order.

## II.  Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  Discussion

### A.    Plaintiff's Motion for Summary Judgment as to Functionality

Valid trademarks may not "comprise[ ] any matter that, as a whole, is functional." 15 U.S.C. § 1052(e). The Plaintiff contends that LIGHT BLUE trade dress is not functional. "The functionality doctrine prevents trademark law, which

seeks to promote competition by protecting a firm's reputation, from instead inhibiting

legitimate competition by allowing a producer to control a useful product feature."

Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 164 (1995).  In the Eleventh

Circuit, there are two tests for determining functionality.  Dippin' Dots, Inc. v. Frosty

Bites Distribution, 369 F.3d 1197, 1203 (11th Cir. 2004).  "Under the first test,

commonly referred to as the traditional test, 'a product feature is functional ... if it is

essential to the use or purpose of the article or if it affects the cost or quality of the

article.'" Id. (quoting TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23,

32 (2001)).  "Under the second test, which is commonly called the competitive

necessity test and generally applied in cases of aesthetic functionality, 'a functional

feature is one the exclusive use of [which] would put competitors at a significant

non-reputation-related disadvantage.'" Id. (quoting TrafFix, 532 U.S. at 32).

First, Ferrari argues that LIGHT BLUE is functional under the traditional test.

Specifically, the Defendant notes that after darkening its overgrip tape in 1999, two

customers complained that the darker tape was less absorbent.  (Carr Dep. at 75-76.)

Ferrari's manufacturer later confirmed that the dark blue tape was indeed less

absorbent. Id. at 77-80.  Thus, the Defendant argues that LIGHT BLUE improves the

performance of overgrip tape.

Ferrari, however, has presented no direct evidence that the color of the grip tape

decreased its absorbency. Indeed, by changing the amount of color paste and florescent powder, Ferrari was able to produce dark blue overgrip that performed better than its original light blue grip. Id. at 84-85. Further, changing the amount of color paste and florescent powder did not alter the product's overall color. Thus, Ferrari has shown that color paste and florescent powder may indeed affect absorbency. The Defendant has not shown, however, that LIGHT BLUE increases grip performance. Thus, there is no issue of material fact as to functionality under the traditional test.

Ferrari also contends that LIGHT BLUE is functional under the competitive necessity test. The competitive necessity test dictates that "if a design's 'aesthetic value' lies in its ability to 'confe[r] a significant benefit that cannot practically be duplicated by the use of alternative designs,' then the design is 'functional.'" Qualitex, 514 U.S. at 170 (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 17 cmt. c (1993)). This test, however, "should not discourage firms from creating esthetically pleasing mark designs, for it is open to their competitors to do the same." Id.; see also Keene Corp. v. Paraflex Indust., Inc., 653 F.2d 822, 825 (3rd Cir. 1981) (rejecting broad view of aesthetic functionality because "it provides a disincentive for development of imaginative and attractive design. The more appealing the design, the less protection it would receive.").

In <u>Brunswick Corp. v. British Seagull Ltd.</u>, 35 F.3d 1527 (Fed. Cir. 1994), the court allowed a competitor to produce black boat engines, reasoning that black made the engines look smaller and coordinated with a variety of boats and accessories. Similarly, in <u>Deere & Co. v. Farmhand, Inc.</u>, 560 F. Supp. 85 (S.D. Iowa 1982), the court permitted a competitor to use "John Deere green" for tractors. The court noted extensive evidence that consumers preferred tractors that match other green farming accessories. Finally, in <u>Unique Sports Products, Inc. v. Babolat VS</u>, 403 F. Supp. 2d 1229 (N.D. Ga. 2005), the court declined to find that light blue grip tape was not functional. The court reasoned that "[a]lthough the defendants have not presented any evidence stating that consumers prefer to match their racquet cosmetics to their overgrips, they have presented evidence that light blue is a very popular overgrip color and that it is complimentary in color to most racquet cosmetics." <u>Id.</u> at 1235.

Here, Ferrari argues that consumers prefer LIGHT BLUE because it coordinates with other tennis accessories. Although, as in <u>Babolat</u>, Ferrari has produced no evidence showing why consumers prefer LIGHT BLUE, the Defendant has offered evidence that LIGHT BLUE coordinates with other tennis accessories. (Carr Dep. at 211.) Further, the Defendant has shown that LIGHT BLUE is among its best selling colors of overgrip. (<u>See</u> Carr Dep. at 211; Pl.'s Br. in Supp. of Pl.'s Mot. for Partial Summ. J., Ex. 7.) The mere popularity of LIGHT BLUE, however, does not indicate

that the color itself is functional.  It is undisputed that tennis racket overgrips in other colors are among the Defendant's best sellers.  The Plaintiff is entitled to summary judgment on the Defendant's functionality defense.

B.    Defendant's Motion for Summary Judgment of Non-Infringement and Cancellation

The Defendant has moved for summary judgment as to Unique's trademark infringement claims in counts I, II, and IV of the Complaint.  For each of these claims, Unique must show (1) that it has a valid trademark in TOURNA GRIP's LIGHT BLUE color, and (2) that the Defendant has adopted a mark confusingly similar to Unique's mark such that customers are likely to confuse the two.  Tana v. Dantanna's, 611 F.3d 767, 773 (11th Cir. 2010).  To be a valid trademark, a "claimed color must not be functional and must have acquired secondary meaning."  Babolat, 403 F. Supp. 2d at 1234 (quoting Qualitex, 514 U.S. at 163).

1.    Secondary Meaning

First, Ferrari contends that there is no issue of material fact as to secondary meaning.  In determining whether a trademark has acquired secondary meaning, the Court considers: "(1) the length and manner of its use, (2) the nature and extent of advertising and promotion, (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the trademark and the plaintiff's business, and (4) the extent to which the public actually identifies the trademark with the plaintiff's

goods and services." <u>Id.</u> at 1237.   Further, the LIGHT BLUE mark must have acquired secondary meaning before the Defendant adopted it.   <u>Gift of Learning Found., Inc. v. TGC, Inc.</u>, 329 F.3d 792, 800 (11th Cir. 2003).

Here, the parties dispute the date on which the Defendant began selling LIGHT BLUE overgrips.  Ferrari contends that it started selling LIGHT BLUE grips as early as 1988.  To support this allegation, Ferrari offers product catalogues from 1988 through 2001.  (<u>See</u> Def.'s Br. in Supp. of Def.'s Mot. for Summ. J., Ex. R.)  The 1988 catalogue indicates that some grip tapes are available in "blue," though no pictures are provided.  <u>Id.</u>  Ferrari's catalogues from 1990 through 1999 include several overgrip products available in "royal blue" or "teal."  <u>Id.</u>  The exact color of these grips, however, is unclear.  Based on the representations in Ferrari's catalogues, many of which do not include pictures of LIGHT BLUE overgrip tape, there is an issue of material fact as to whether the Defendant was using LIGHT BLUE "or a similar color" as early as 1988.[3]

The Plaintiff contends that Ferrari did not begin marketing LIGHT BLUE overgrip tape until after Unique registered its trademark in 2001.  Thus, Unique

---

[3]Harry Ferrari also claims that the Defendant began selling LIGHT BLUE grip tape in 1988.  (Ferrari Dep. at 81.)  Ferrari, however, bases his claims on his review of product catalogues.  <u>Id.</u> at 83.  As discussed above, the Court has reviewed these catalogues and cannot conclude as a matter of law that the Defendant was marketing LIGHT BLUE grip tape in 1988.

argues, its LIGHT BLUE mark is presumed to have secondary meaning. See Babolat, 403 F. Supp. 2d at 1236 (plaintiff is entitled to presumption of secondary meaning as of the date that mark is registered). Unique, however, sued the Defendant in 1999, alleging that Ferrari was marketing LIGHT BLUE overgrip tape. Indeed Ferrari's 1999 and 2000 product catalogues picture grip tape in some shade of LIGHT BLUE. (See Def.'s Br. in Supp. of Def.'s Mot. for Summ. J., Exs. R5, R6.) Thus, the Plaintiff's mark is not entitled to a presumption of secondary meaning. As discussed below, however, even if the Defendant began marketing LIGHT BLUE grip tape in 1999, there is an issue of fact as to whether LIGHT BLUE acquired secondary meaning before 1999.

The first factor in the secondary meaning analysis is the length and manner of the Plaintiff's use. Here, LIGHT BLUE TOURNA GRIP has been on the market since 1977. (Niksich Dep. at 53.) In 1999, more than 50 million LIGHT BLUE TOURNA GRIP products had been sold, accounting for sales over $40 million. (Niksich Decl. ¶ 5.) Further, before 1999, TOURNA GRIP was being used by prominent professional tennis players, including Andre Agassi and Pete Sampras. Thus, the length and manner of use weigh in favor of the Plaintiff.

The second factor looks to the nature and extent of advertising efforts. Here, Unique has spent more than $3 million advertising TOURNA GRIP between 1977 and

1999. (Niksich Decl., Ex. B-2.) Further, Unique's advertising campaign has included prominent professional tennis players.  (Niksich Decl., Ex. B-3.)  Similarly, the third factor considers the Plaintiff's efforts to promote a conscious connection in the public's mind between the mark and the Plaintiff's business.  Here, Unique has promoted TOURNA GRIP as "thin, blue TOURNA GRIP," "the original blue, super absorbent non-slip grip," "the original blue grip" and "Blue Tape." Id.  Also, since at least as early as 1999, Unique has advertised TOURNA GRIP as "the LIGHT BLUE grip that does not slip."  (Niksich Decl. ¶ 14.)  Thus, Unique has spent significant resources promoting TOURNA GRIP and its LIGHT BLUE mark.  For this reason, the second and third factors weigh in favor of the Plaintiff.

The fourth factor considers the extent to which the public identifies the LIGHT BLUE mark with the Plaintiff.  On this issue, Unique points to a 2002 study by the United States Racquet and Stringers Association in which members were asked whether they associated LIGHT BLUE overgrip with a particular brand. Approximately 85% responded that they did.  Of that 85%, 87% associated LIGHT BLUE overgrip with TOURNA GRIP.  (Niksich Decl. ¶ 4, Ex. 1.)  Although this study was conducted after 1999, it is some evidence that the public identifies LIGHT BLUE overgrip tape with TOURNA GRIP.

Ferrari contends, however, that third party use of the Plaintiff's mark makes it

unlikely that the public associates LIGHT BLUE with Unique.  Specifically, the Defendant notes that Unique permits Head to sell LIGHT BLUE TOURNA GRIP. The Defendant also alleges that other sporting goods companies sell LIGHT BLUE grip tape, although Ferrari has not produced any evidence of the sale of such grips. In response, the Plaintiff points out that sales of Head's grip tape account for only .006% of all TOURNA GRIP sales in the United States.   (Niksich Decl. ¶ 10.) Further, Unique notes that the packaging on Head's grip tape states that the product is "made by TOURNA GRIP."  (Niksich Decl. ¶ 10.)  Thus, the Plaintiff argues, third party use is de minimus and does not prevent a finding that the public identifies LIGHT BLUE with Unique's products.  On balance, this factor does not strongly favor the Defendant.  Thus, the first three factors all favor the Plaintiff.  Further, the fourth factor does not weigh heavily for the Defendant.  For these reasons, there are issues of material fact as to the secondary meaning of the Plaintiff's LIGHT BLUE mark.

> 2.   <u>Functionality</u>

The Defendant also contends that the Plaintiff's mark is invalid because LIGHT BLUE is functional.  As discussed above, there is no issue of material fact as to functionality under the traditional test.  Ferrari argues, however, that LIGHT BLUE is functional under the competitive necessity test.  Specifically, Ferrari points out that

LIGHT BLUE matches other tennis accessories and is a very popular color for overgrip tape.  (Carr Dep. at 204-207; 211.)  As noted above, however, the Defendant has produced no evidence that consumers prefer to match tennis accessories to their overgrips.  (See Carr Dep. at 206-207.)  Neither has the Defendant shown how many tennis accessories are LIGHT BLUE.

Further, the popularity of LIGHT BLUE does not establish that it is functional as a matter of law.  Indeed, such a narrow focus would create "a disincentive for development of . . . attractive design.  The more appealing the design, the less protection it would receive."  Keene, 653 F.2d at 825.  Here, white and black, not LIGHT BLUE, are Ferrari's best selling overgrip colors.  (See Pl.'s Br. in Supp. of Pl.'s Mot. for Partial Summ. J., Ex. 7.)  According to Ferrari's sales numbers, therefore, LIGHT BLUE does not "confe[r] a significant benefit that cannot practically be duplicated by the use of alternative [colors]."  Qualitex, 514 U.S. at 170.  Indeed, black and white have more than duplicated that success.  Thus, taking all inferences in favor of the Plaintiff, a reasonable jury could conclude that LIGHT BLUE is not functional under the competitive necessity test.  For this reason, there is an issue of material fact as to the functionality of Ferrari's LIGHT BLUE mark.

3.    Likelihood of Confusion

The Defendant also argues that there is no issue of material fact regarding

likelihood of confusion between its products and Unique's. "Likelihood of confusion is assessed by examining seven factors: (1) distinctiveness of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods or services offered under the two marks; (4) similarity of the actual sales methods used by the two parties, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) existence and extent of actual confusion in the consuming public." Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1360 (11th Cir. 2007). Of the factors, "the type of mark and the evidence of actual confusion are the most important." Frehling Enters. v. International Select Grp., 192 F.3d 1330, 1335 (11th Cir.1999).

The first factor focuses on the distinctiveness of the mark. "The stronger or more distinctive a trademark or service mark, the greater the likelihood of confusion and the greater the scope of protection afforded it, and conversely, the weaker the mark, the less protection it receives." Welding, 509 F.3d at 1361. The Defendant asserts that third party use of LIGHT BLUE overgrip tape shows that Unique's mark is weak. See Frehling, 192 F.3d at 1336 ("The less that third parties use the mark, the stronger it is, and the more protection it deserves."). Specifically, Ferrari points to several settlement agreements in which Unique allowed competitors to sell blue grip

tape.  (See Def.'s Br. in Supp. of Def.'s Mot. for Summ. J., Exs. H, K.)[4]  The Defendant, however, misunderstands the nature of these agreements.  As Unique points out, the settlement agreements ensured that competitors *did not* market LIGHT BLUE grip tape.  Indeed, Unique does not claim trademark protection for all shades of blue grip tape, but rather a specific LIGHT BLUE color represented by the prohibitions in the settlement agreements.  (See Niksich Decl. ¶ 13.)  Further, Unique claims that it has vigorously and successfully defended exclusive use of its LIGHT BLUE mark, preventing competitors from marketing LIGHT BLUE overgrips.  (See id. ¶ 8.)  Thus, "rampant" third party use has not weakened the Plaintiff's mark.  For this reason, the first factor does not weigh heavily in favor of the Defendant.

The second factor measures the similarity between the infringed and infringing marks.  "In evaluating the similarity of marks, we must consider the overall impression created by the marks."  E. Remy Martin & Co. v. Shaw-Ross Int'l Imports, Inc., 756 F.2d 1525, 1531 (11th Cir. 1985).  Further, "[w]here the goods and services are directly competitive, the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products."  SunAmerica Corp. v. Sun

---

[4]The settlement with Babolat allows Babolat to sell overgrips in any color except twelve specified Pantone shades.  (See Def.'s Br. in Supp. of Def.'s Mot. for Summ. J., Ex. H.)  The settlement with Yonex allows Yonex to sell overgrips lighter than Pantone 319C or darker than 293C.  See id., Ex. K.

Life Assurance Co. of Canada, 890 F. Supp. 1559, 1575 (N.D. Ga. 1994) (quoting 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:03 at 23-40).  In this case, the Defendant's LIGHT BLUE overgrip is directly competitive with TOURNA GRIP.  Ferrari argues, however, that its products are a darker shade of blue and, other than one line of grip tape, are not speckled like TOURNA GRIP.  Here, although the products are not identical, both overgrips are a similar shade of blue.  Thus, because the products are directly competitive, the second factor favors the Plaintiff.

The third, fourth, and fifth factors analyze the similarities between the parties' products, advertising, and marketing strategies.  Here, the Court has reviewed both overgrips.  (See Joint Physical Exs. 2-7.)  Although not identical, the products are similar.  Also, both parties use similar advertising strategies.  (See Niksich Decl. ¶ 11.) Finally, both parties sell their products in sporting goods stores, mass merchandise stores, and through the internet. (Carr Decl. ¶ 8.)  Indeed, the Defendant concedes that there are many similarities with respect to each of these factors.  Thus, the third, fourth, and fifth factors favor the Plaintiff.

The sixth factor focuses on the Defendant's intent to derive a benefit from the Plaintiff's business reputation.   In Frehling, the defendant argued that it was "intentionally blind" in adopting a mark similar to the plaintiff's.  Frehling, 192 F.3d

at 1340.  The defendant had failed to conduct a trademark search before attempting to register its mark.  Further, the court noted that the Patent & Trademark Office refused to register the defendant's mark "because of the potential likelihood that it may be confused with [the plaintiff's] earlier-registered" mark.  Id.  The Eleventh Circuit found that the defendant's conduct indicated an intent to benefit from the plaintiff's reputation.  The court reasoned that "[the defendant] clearly had notice as to the strong similarity of the marks and hence was aware that they may be confused and yet continued to use the [plaintiff's] mark."  Id.

Here, as in Frehling, the Defendant had notice of the similarity between the two marks.  Indeed, Unique filed and settled a previous lawsuit against Ferrari alleging similar infringement of its LIGHT BLUE mark.  (See Niksich Decl. ¶¶ 10-11.) Further, Unique notes that leading up to this litigation, the Defendant promised to destroy 3,000 units of infringing grip tape.  (Niksich Decl. ¶ 15.)  Rather than discontinue the sale of such products, however, Ferrari filed suit in Pennsylvania seeking a declaratory judgment regarding Unique's infringement claims.

Ferrari stresses, however, that it has repeatedly made changes in response to concerns that its products infringed Unique's LIGHT BLUE mark. (See Niksich Decl. ¶ 15; Def.'s Br. in Supp. of Def.'s Mot. for Summ. J., Exs. P, Q.)  The Defendant also notes that there is no direct evidence of an intent to derive benefit from Unique's

business reputation.  Nevertheless, as in <u>Frehling</u>, Ferrari had notice of Unique's mark.  Further, the Defendant has repeatedly and continually manufactured grip tape that allegedly infringes the Plaintiff's mark.  Thus, this factor does not clearly weigh in favor of the Defendant.

Finally, the seventh factor considers the existence of actual confusion between the products.  "It is undisputed that evidence of actual confusion is the best evidence of a likelihood of confusion."  <u>Frehling</u>, 192 F.3d at 1340.  "However, such evidence is not a prerequisite, and thus it is up to individual courts to assess this factor in light of the particular facts of each case."  <u>Id.</u>; <u>see also</u> <u>E. Remy Martin</u>, 756 F.2d at 1529 ("The law is well settled in this circuit that evidence of actual confusion between trademarks is not necessary to a finding of likelihood of confusion, although it is the best such evidence.").  Here, the Plaintiff concedes that there is no evidence of actual confusion.  Thus, this factor favors the Defendant.

Evaluating the seven factors as a whole, factors one, two, three, four, and five all favor the Plaintiff.  The sixth factor, the Defendant's intent, does not weigh heavily for the Defendant.  Indeed, only the lack of evidence of actual confusion favors Ferrari in this case.  Thus, on balance, the likelihood of confusion factors favor the Plaintiff.  <u>See</u> <u>Frehling</u>, 192 F.3d at 1342 (finding likelihood of confusion where factors one, two, and six favored plaintiff, factors three and four did not weigh heavily in

defendant's favor, and factor seven did not favor either side). There is therefore an issue of material fact as to likelihood of confusion.  For these reasons, summary judgment is inappropriate as to counts I, II, and IV of the Plaintiff's Complaint.

      C.    <u>Defendant's Motion for Summary Judgment of No Violation of the Final Order</u>

The Defendant has moved for summary judgment on the Plaintiff's claim that Ferrari has violated the Final Order.  The Final Order permanently enjoins Ferrari from "using the Specified LIGHT BLUE Color . . . in connection with overwrap grip material for sports rackets."  (Def.'s Mot. for Summ. J., Ex. C.)  Further, the Final Order defines LIGHT BLUE "as any overwrap grip material having any blue color lighter than the color designated as 293(c) in the Pantone Color Selector *and* wherein said material has speckles and a chamois surface texture like the LIGHT BLUE overwrap grip material that the Plaintiff is presently selling under its 'TOURNA GRIP' mark."  <u>Id.</u> (emphasis added).  Thus, the Final Order prohibits Ferrari from using blue overgrip material that is (1) lighter than Pantone 293(c), (2) speckled, and (3) has a chamois surface texture.

Here, the Defendant has not used any material that is lighter than Pantone 293(c) *and* has a speckled, chamois surface texture.  Although Unique claims that Ferrari has sold overgrips that are LIGHT BLUE, the Plaintiff has offered no evidence that the Defendant's products are also speckled and have a chamois surface texture.

For this reason, there is no issue of material fact as to the Defendant's violation of the Final Order.

## IV.  Conclusion

For the reasons set forth above, the Court GRANTS the Plaintiff's Motion for Partial Summary Judgment [Doc. 59], DENIES the Defendant's Motion for Summary Judgment of Non-Infringement and Cancellation [Doc. 61], and GRANTS the Defendant's Motion for Summary Judgment of No Violation of the Final Judgment [Doc. 71].

SO ORDERED, this 23 day of January, 2011.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge